IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PEARL RAY, and ANDREW RAY, SR., ) | |
| ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ) | |
| MUHAMMAD TABRIZ, MD., ) | |
| ) | No. 23 C 1467 |
| *Defendant*. ) | |
| v. ) | Hon. Virginia M. Kendall |
| ) | |
| BLUE CROSS AND BLUE SHIELD ) | |
| ASSOCIATION, as carrier for Federal ) | |
| Employee Program, ) | |
| ) | |
| *Lien Holder*. ) | |

**MEMORANDUM OPINION AND ORDER**

Blue Cross and Blue Shield Association ("BCBSA") entered into a contract with the federal government to provide healthcare plans for federal employees. Pearl Ray enrolled in one plan. Later, Pearl Ray received allegedly deficient medical care at the hands of various doctors and health professionals. BCBSA paid Ray's healthcare bills, in the amount of $218,954.87. Pearl Ray and her husband, Andrew Ray, Sr., brought state medical-malpractice claims against eleven defendants. The Rays agreed to a settlement that would dismiss every defendant except one. BCBSA, upon learning of the lawsuit, placed a lien for the healthcare expenses paid on any potential recovery the Rays would gain. In state court, the Rays sought to prevent BCBSA from recovering the full amount sought. BCBSA removed the state case to federal court. The Rays now move to remand the case back to the state court. (Dkt. 11). For the following reasons, the motion is denied. (*Id.*)

## BACKGROUND

Pearl Ray enrolled in the Blue Cross and Blue Shield Service Benefit Plan ("the Plan"). (Dkt. 1 ¶ 5). The federal government has a contract between its United States Office of Personnel Management ("OPM") and BCBSA; that contract led to the creation of the Plan, an option for employee healthcare. (*Id.*) The Plan's Statement of Benefits states that BCBSA has the right to reimbursement from an enrollee for the benefits paid if the enrollee recovers for a condition or injury from a third party. (*Id.* ¶ 6). BCBSA exercises its right under this provision by placing a reimbursement lien against a recovery amount. (*Id.*)

In 2018, Pearl Ray and her husband, Andrew Ray, Sr., brought a medical-malpractice lawsuit against eleven defendants—including Dr. Muhammad Tabriz—in Illinois Circuit Court for care rendered two years before. (Dkt. 11 at 1). BCBSA, pursuant to the Plan, had paid $218,954.87 in connection with the alleged injuries caused by the defendants, (Dkt. 1 ¶ 4), and upon learning of the lawsuit, BCBSA placed a lien against any prospective recovery the Rays might gain. (*Id.* ¶ 6).

The Illinois Circuit Court scheduled a trial for the state-court case in March 2023. (Dkt. 11 at 2). On the eve of trial, the Rays settled with all the defendants except Tabriz. (*Id.*) They moved for a "Good Faith Finding" regarding the settlement and filed a "Motion for Apportionment" to apportion the proceeds of the settlement with all the settling defendants. (*Id.*) The Illinois Circuit Court accepted the "Good Faith Finding" and entered a briefing schedule on the Motion for Apportionment. (*Id.*) Shortly thereafter, the Rays filed a "Motion for Adjudication," asserting that "the common fund doctrine" reduces the amount owed to BCBSA. (*Id.* at 3). That motion was set to be heard on March 10, 2023. (*Id.*) On March 7, 2023, the Illinois Circuit Court apportioned the settlement proceeds. (*Id.* at 4). Two days later, on March 9, 2023, BCBSA filed a Notice of

2

Removal in this Court and in the Illinois Circuit Court, asserting that removal of the state-court case is appropriate because the suit involves a federal officer or, in the alternative, a federal question.[1] (Dkt. 1 ¶ 11); *see also* 28 U.S.C. §§ 144, 1442. The Rays move to remand the case to state court. (Dkt. 11). In response, BCBSA concedes that federal-officer removal applies "only [to] a 'proceeding' (not the entire case)," so the complete removal sought here depends on BCBSA's latter argument: federal-question jurisdiction. (Dkt. 16 at 7).

## DISCUSSION

Section 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant … to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. §§ 1441. BCBSA maintains that the Rays' underlying state claim contains a federal question, which a federal district court would have original jurisdiction over. *See* 28 U.S.C. § 1331. Specifically, the "federal common law displace[s] state law under cases like *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943) and *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988)."[2] (Dkt. 16 at 8).

---

[1] The Rays argue that the case must be remanded because the appropriate Notice of Filing Notice of Removal was not put before the state court until March 14, 2023. (Dkt. 11 at 6–7). By that time, the original the Illinois Circuit Court struck the Motion for Adjudication, so there was no pending matter to be removed. (*Id.* at 7). Section 1446(d) provides that the defendant must "file a copy of the notice with the clerk of [the] State court, which shall effect the removal." 28 U.S.C. § 1446(d). But BCBSA did exactly that. It filed the notice on March 9, 2023, before the state court allegedly struck the matter. (Dkt. 16 at 5). While the state court asked the plaintiff to "refile" the motion, "refile" means "file" again; it does not imply that the motion was never lodged in the first place. The statute never uses the words "refile" or "accepted for filing." Thus, BCBSA properly followed the procedure for removal.

[2] Two clarifying points:

*First*, although the Rays appear to believe otherwise, BCBSA does not posit that the underlying state lawsuit involves a state claim with the necessary federal element for federal-question jurisdiction, *see Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), or is governed by the doctrine known as "complete preemption," *see Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1 (2003). (*See generally* Dkt. 16).

*Second*, both parties do not dispute that an applicable federal common-law rule would confer this Court with jurisdiction. While a traditional state-law dispute does not arise under the laws of the United States, "[s]ometimes the federal interest in a controversy is so dominant that federal law applies …." *Downey v. State Farm Fire & Cas. Co.*, 266 F.3d

It is hornbook law—learned by generations of law students—that *Erie Railroad Company v. Tompkins* ended "federal general common law." 304 U.S. 64, 78 (1938). But that broad proclamation can be misleading. More accurately, *Erie* ushered in a "keener understanding" of federal common law. *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421 (2011). Traditional areas of state law are left to the states, and federal courts follow state-court decisions "on matters of state law appropriately cognizable by the states." Henry J. Friendly, *In Praise of* Erie—*And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 422 (1964). At the same time, limited areas of specialized "federal common law" still exist. *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1258 (10th Cir. 2022). Most fall under two categories: "those in which a federal rule of decision is necessary to protect uniquely federal interests and those in which Congress has given the courts the power to develop substantive law." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (cleaned up). BCBSA asserts the first category applies.

Some uniquely federal interests "are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). To determine if the interest is "committed" to federal control, courts employ a two-part framework, asking (1) whether the circumstances justify a court-fashioned federal-law rule to protect uniquely federal interests, *Rodriguez v. Federal Deposit Insurance Corp.*, 140 S. Ct. 713, 717 (2020), and

---

675, 680 (7th Cir. 2001). "*Clearfield Trust Co. v. United States* establishes that, when the duties or rights of the United States are at stake under a federal program, that federal interest requires the application (and if necessary the creation) of federal law." *Id.* at 681 (internal citation omitted). That requirement brings the case within the purview of 1331 and, by extension, 1441(a). *See id.*; *see also Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 689–93 (2006) (accepting that a significant conflict between a federal policy and the operation of state law would be permitted in federal court); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979) ("This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs.").

Case: 1:23-cv-01467 Document #: 23 Filed: 07/11/23 Page 5 of 9 PageID #:2334

if so, (2) whether a conflict exists between a state law and the proposed federal rule, *Empire Healthcare Assurance, Inc., v. McVeigh*, 547 U.S. 677, 692 (2006). In answering that latter inquiry, several (nonexclusive) factors guide the analysis: the significance of the federal interest in uniformity, the hardship caused by a state law to a federal program, and the disruption that a federal law might have on state commercial relationships. *Evergreen Square of Cudahy v. Wisc. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 828 (7th Cir. 2017); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29 (1979). Although "strict conditions" limit federal common-lawmaking, *Rodriguez*, 140 S. Ct. at 717, the Supreme Court has, for over eighty years, fashioned federal rules of decision that displace state law. *See, e.g.*, *Clearfield Trust*, 318 U.S. 363 (commercial paper); *Farmers Educ. & Co-op. Union v. WDAY, Inc.*, 360 U.S. 525 (1959) (radio-broadcaster immunity for adhering to the federal "equal time" law); *Boyle*, 487 U.S. 500 (government contractor defense for design defect in military equipment). *But see Kimbell Foods, Inc.*., 440 U.S. 715 (contractual liens from federal loan programs); *Atherton v. Fed. Deposit Indus. Corp.*, 519 U.S. 213 (1997) (standard of care in a suit involving a federal savings association); *Rodriguez*, 140 S. Ct. 713 (tax allocation agreements).

 Here, Illinois's common-fund doctrine—which, according to the Rays, bars a contracting insurance company from recovering medical expenses paid out of a settlement agreement—conflicts with the unique federal interest of providing healthcare to the federal workforce. First, some statutory background. The Federal Employees Health Benefits Act of 1959 ("FEHBA") created a "comprehensive program of health insurance for federal employees." *Empire Healthchoice*, 547 U.S. at 682. The law permitted the OPM to contract with private carriers for the provision of federal-employee healthcare. *Id.*; *see also* 5 U.S.C. § 8902(a). Under the FEHBA, carriers must outline "a detailed statement of benefits offered and shall include such maximums, limitations,

5

exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." *Id.* § 8902(d). The federal government pays 75 percent of premiums, and the employee pays the rest. *Id.* § 8906(b). The shared premium goes into a special Treasury Fund, the Federal Employees Health Benefits Fund, which carriers use to pay benefits. *See Empire Healthchoice*, 547 U.S. at 684 (citing 5 U.S.C. § 8909(a) and 48 CFR § 1632.170(b) (2005)). Since the beginning, BCBSA has maintained a contract with OPM that provides healthcare to millions of federal employees (making BCBSA the largest federal healthcare carrier).

There is "little debate that the contract" and the "provision of affordable quality healthcare" implicate a unique federal interest. *See Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1098 (10th Cir. 2015).[3] The United States employs millions of workers. The government attracts high quality employees by offering healthcare, and it must continually keep its workforce healthy and ready to perform. *Id.* Congress recognized this need by enacting the FEHBA to provide this comprehensive, quality healthcare. Under the program, it is the federal government—not BCBSA—that pays the majority of premiums, and it is the federal government's employees that pay the rest. 5 U.S.C. § 8906(b).

Laws banning insurance companies, such as BCBSA, from collecting money from settlements conflict with this federal interest. *Helfrich*, 804 F.3d at 1099. The money received from reimbursement can either reduce premiums or be used to increase coverage for federal employees. *Id.* The prospect of decreased compensation might "deter a contractor from doing the

---

[3] The Tenth Circuit concluded the same in *Helfrich v. Blue Cross & Blue Shield Association*, 804 F.3d 1090, and this Court follows its reasoning. Like Illinois, Kansas law prohibits an "insurance company or health insurer" from issuing "any contract or certificate of insurance in Kansas containing a subrogation clause, or any other policy provision having a purpose or effect similar to that of a subrogation clause, applicable to coverages providing for reimbursement of medical, surgical, hospital, or funeral expenses." *Id.* at 1095 (quoting Kan. Admin. Regs. 40–1–20). The plaintiff, Lee Ann Helfrich, was a federal employee enrolled in a BCBSA healthcare plan, under a contract that had a subrogation clause. *Id.* at 1094. After a car accident left her with serious injuries, Helfrich sued the other driver and reached a settlement worth $100,000. *Id.* BCBSA immediately attempted to recover $76,561.88 for the covered medical expenses. *Id.*

government's bidding or cause it to raise the contract price." *Id.* Furthermore, the federal interest strongly favors uniformity:

> Recognition of state antisubrogation laws would create unfairness within the ranks of government employees. Those in states without such laws would have to pay reimbursements that are then used to benefit enrollees throughout the country, even those who live in states where they could keep their tort recoveries without paying reimbursements.

*Id.* The FEHBA functions, in part, to impose uniform employee benefits; permitting states to reintroduce disparate results would engender the very unevenness the law aims to rectify.

The arrangement between BCBSA and OPM makes these propositions even more forceful. *Id.* at 1100. BCBSA merely acts as a service agent between the federal government and its own employees. *Id.* In fact, the contract between BCBSA and OPM requires the carrier to make "a reasonable effort to seek recovery of amounts of which it is entitled to recover in cases which are brought to its attention." (Dkt. 1 ¶ 10). "BCBSA does not have skin in the game; it does not underwrite the risk in the insurance coverage. It merely acts as a facilitator for OPM …." *Helfrich*, 804 F.3d at 1100. The cost imposed by state anti-subrogation provisions, then, is primarily passed along to the federal government—not BCBSA. *Id.*

The Seventh Circuit reached a similar conclusion in an analogous case. *Downey v. State Farm Fire & Cas. Co.*, 266 F.3d 675 (2001). The plaintiff, Michael Downey, lived on a hill with a steep background, which eventually succumbed to soil erosion. *Id.* at 678. Anticipating that possibility, Downey purchased flood insurance in advance through State Farm. *Id.* The resulting contract, the insurance company argued, did not cover all the home damage sustained. *Id.* Downey sued in federal court, arguing jurisdiction was proper because he purchased his insurance through the National Flood Insurance Program ("NFIP"). *Id.* The Seventh Circuit agreed. "In a sense … State Farm is a place-holder for FEMA [the Federal Emergency Management Agency." *Id.* at 680.

7

The NFIP is a federal program, and so, "uniform judicial interpretations of the standard insurance policies are necessary." *Id.* If FEMA were a defendant, there would be "no doubt that federal law applied." *Id.* at 681. "FEMA runs a federal program, and because it bears the risk on all NFIP contracts, FEMA's duties are at issue whenever an NFIP policy is interpreted." *Id.* Replace "FEMA" with "State Farm" and nothing changes. "[A] judgment against State Farm and a judgment against FEMA have identical effects: FEMA pays." *Id.* The same is true for BCBSA. Any money recovered goes back to the federal government, in one form or another. BCBSA simply acts a "place-holder," and where a private contractor stands in the shoes of the federal government, the need for a federal rule of decision becomes more pronounced.

*Empire Healthchoice* does not compel a different result. 547 U.S. 677. There, the Supreme Court considered the FEHBA in the context of federal common law, but contrary to the Rays' position, it never foreclosed the possibility that a federal rule of decision would override state law. *See id.* at 693. The court below concluded there was no significant conflict between a federal policy and the operation of state law *in that case*. *Id.* The Supreme Court found no error because, it agreed, no conflict existed. "Unless and until that showing is made, there is no cause to displace state law …." *Id.* A *different* case, however, would require a different result if the critical second step was met. The concurring judge below said as much—in an opinion that the Supreme Court approvingly cited three times. "[A] future litigant in a similar action may, unlike Empire here, be able to point to specific ways in which the operation of state contract law, or indeed of other laws of general application, would conflict materially with the federal policies underlying FEHBA in the circumstances presented." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 396 F.3d 136, 150 (2d Cir. 2005) (Sack, J., concurring); *see also Empire Healthchoice*, 547 U.S. at 688–89, 693. That

8

hypothetical example is the case before this Court. BCBSA has pointed to specific ways the operation of state law conflicted with the FEHBA's underlying principles.

The Rays emphasize that the federal government is not a party to this case, and as a result, a rule to protect the federal government is unnecessary. But unambiguous precedent stops that argument dead in its tracks. The Supreme Court, in *Boyle v. United Technologies Corp.*, recognized a government contractor defense in a tort lawsuit between a plaintiff and a private government contractor. 487 U.S. at 504–05. And the Seventh Circuit, in *Downey v. State Farm Fire & Casualty Co.*, applied that principle to a dispute between a plaintiff and a private insurance company. 266 F.3d at 681. It is true that "[t]ypically the United States is a party to disputes that call for federal law under the approach of *Clearfield Trust*. But there is no reason to view that condition as a necessity." *Id.* (citations omitted). Accordingly, this Court has jurisdiction. 28 U.S.C. 1441(a); *see also id.* 1331.

## CONCLUSION

For these reasons, the Rays' motion to remand is denied. (Dkt. 11).

Virginia M. Kendall
United States District Judge

Date: July 11, 2023

9